Thank you, your honors. May it please the court, my name is Peter Carter with the Federal Public Defender's Office and I'll be counsel for Appellant David Kollie. I'd like to reserve three minutes in rebuttal. Thank you. On a couple of days before the trial started on April 19th in this matter, we received two letters, one dated the 17th and one dated the 18th, which provided us with two women had had interactions with the co-conspirator, in this case Taufiq Haruna, and the letters basically stated, with respect to Ms. Ogunsulo, that Mr. Haruna had befriended her and that ultimately he had convinced her through what I would suggest are false representations that to allow the use of her mailing address, and it was determined that Katrina checks passed through that mailing address. I received a letter the next day, I believe the day before the trial started, that a woman named Ms. Obayate had been similarly befriended by Taufiq Haruna and that she had been convinced through misrepresentations, deception, to allow the use of both her mailing address and bank account, and very importantly a bank account, a check, a Katrina disaster relief check passed through that. You refer to them as Katrina checks, but there is really nothing in these letters that indicate that that storyline, if you will, was shared with either of these women, is there? And by the way, the Katrina relief aspect is totally fiction in any event. Sure. But answer my first question, there's nothing that indicates that that he told either of these women these are Katrina relief checks. Oh right, that's correct. I think that, I mean, the way I read the letters that there were misrepresentations, that Mr. Haruna said I need a reference with respect to Ms. Ogunsulo, and then it doesn't exactly say what representations were made to Ms. Obayate, but I think given the fact that they were, it's my position that these were disclosed as essentially exculpatory materials, and I think the government did its duty in disclosing them, and so I think it's fair, I think it's fair to say that there were misrepresentations. Right, but you can't bolster his story that I was told these were Katrina relief checks by reference to these these two women, because that's not part of what they said happened, correct? Well, I would take the position that I should, obviously that I should have been allowed to do that, because what I, you know, what I suggested at the oral argument is that these letters, not the letters, but the testimony that would have, you know, that would have been. Excuse me, let me stop you right there. Is it evident that you intended to put these women on the stand? Yes, yes it is, and the record is very clear, and it's referenced in the brief, that both the Ms. Obeyade and Ms. Ogunsula, and I think it's referenced in the brief, and so I think that's, I think that the argument that this was, that it was inadmissible hearsay is not supported by the record. So to get back to your, your question, what my position is, and I said at the our demonstrative, our proof of a pattern of deception on the part of Mr. Taufiq Haruna, and I submit to the court that that, in fact, is a proper purpose under 404B. 404B lists, you know, potential purposes, motive, opportunity, intent, etc., but it says such as, so it's not limited to those particular purposes, but I think that it's very, the, the proffer that I made at the time in the legal argument, I think it's very much akin to a common scheme or plan on the part of Taufiq Haruna, and my, my position here is that Taufiq Haruna deceived these individuals in an overall scheme to both obtain the checks. The way he obtained the checks, he needed to have a mailing address. So for example, he used Ms. Ogunsula's mailing address to initially apply for the check. He used Ms. Ogunsula's and Ms. Obeyati's addresses to actually get the check sent to him, and then he used Ms. Obeyati's bank account to pass through. So your, your best argument, I guess, is that it would show that Kali wasn't necessarily in cahoots with Haruna. Correct. That Haruna had the ability to pull the, to tell tall you know, these guys were scheming from the, from the get-go. You would say, well, but he does, he does this, and so he did this in this situation. But how does that get you to get you all the way, you know, in terms of the prejudice here? Because you've got a problem with a willful blindness. Let's assume, for the sake of argument, that they weren't in cahoots and Haruna told him this tall tale, and he's doing this, and he's giving Haruna back some money. At some point, you know, and then he keeps the one check entirely. At some point, a light bulb, you know, goes off, you know, and he, his confession says, you know, I knew this was wrong. Don't you have a problem with, you know, the kind of the second prong? Because the jury could easily have found willful blindness, even if in the beginning they weren't in cahoots. Right. Well, I think one, one of the interesting things is that the, in the prosecution's summation here, they call this a cover story. And there was certainly argument and intimation that sometime after Mr. Kali had contact with the agents, when he, when he made that statement that you referred to, that he had, at some point after that, made up this story, and that it was a cover story. And, and that, in the absence of that, this evidence, the jury had little choice under these circumstances to say, no, Mr. Kali was not naive. He was not being just, you know, non-criminally stupid. But in fact, that he, you know, knew or should have known. And so, this is a situation where this evidence would stand as a very strong counterbalance. And obviously, the burden at trial is merely, you know, that I have to demonstrate a reasonable doubt. So, the jury could have balanced that information with the information that could have led that. And certainly, the if there is a retrial to, to make those, those arguments. But I would just point out, for example, that Ms. Ogunsulo came to me as a government grand jury witness. That the government, it's apparent from the letter that Ms. Ogunsulo was, you know, I mean, just based on common practice, that she was interviewed, she was determined to be truthful, that she, and she testified in the grand jury, that she unwittingly did these things on behalf of, you know, of Mr. Taufiq Haruna. And certainly, you know, in that situation, there might be some countervailing signs if, if we knew all, if we knew every possible fact about her interaction with, there might be some countervailing signs. But even the government in, in, in looking at her testimony, credited her testimony. And obviously, that's not you know, something that goes directly to this. But I think that it's a, it's a, it's a balancing act. And I think that. Well, he obviously knew that the story that he was told about the $7,000 check wasn't so. Well, I, I think that, that goes to something different. What his initial. Well, whatever it goes to, doesn't it go against your argument? Well, I sort of, the, the government is free to, to make that argument. But I think it could also be said that his initial acquisition of the check was done innocently. And what he, if, if any. Innocently? Well, I, I think that's, it certainly could be, could be stated in that his failure. Even if he acquired it innocently, he didn't keep it innocently. Right. And I think it could be argued that, even if that were the fact that what he did there was that what, if he committed a crime there, it would be committing a crime of ordinary theft against. Is there any question that he committed a crime there? By the, keeping and depositing a check that wasn't his? I, I, you know, I. That was made out to somebody whom he didn't know? Well, okay, I think that what, what could be argued here, and what I think the position that I would have to take here is that, if there was a crime, it was not one of the federal crimes that were part of the indictment. And I think that it might actually be, you know, that it would be, if anything, ordinary theft or something of that nature. He testified. I guess, I understand that argument, but I guess my, my problem with your overall argument is, let's assume for a minute the evidence should have come in. With Ogunsulu and Abayade, that it was relevant, that there was a mistake of analysis here. I'm struggling with why it would make a difference, because Cawley seemed to be dissimilarly situated to those two ladies. They allowed their addresses to be used, whereas this gentleman is taking checks and pocketing money, usually a few hundred dollars, but then we've got the later incident of the 7,000. So how, how could the evidence that, that we're assuming should have come in, how could it have been material and, and made a difference? Well, I think if, if I just refer to the McClure case and the Vallejo case, and they both talk about the situations where it's not harmless error, where there is a lack of evidence about intent. And so, you know, in those cases, the, the evidence that, the evidence that was proffered, the court's rules should have come in, because it went directly to Vallejo, they referenced Wigmore, talking about how even if, even if the, the defense, the defense or the proposition is speculative, it is not the role of either the district court or the court of appeals to substitute its judgment about the merits of that defense, and that evidence, you know, should come in. I think, again, I think that the, it's a totally different trial. If this evidence comes in, the arguments that the, the prosecution can make are very different. The rebuttal that I can make towards those arguments, and again, you know. Yeah, what is the rebuttal that you can make towards those arguments? Well, you mean, like, point by point of each of them? I don't know, you, you, you just use those words, I'm just giving them back. Well, that, basically, my rebuttal is that Tofi Caruna is the, the hub of this wheel, that Ogunsula was one spoke, that she was used to get, to get checks sent to an address, Ms. Oboyade was used to use her bank account and her address, and Mr. Colley was used in a, to do, obviously, to actually cash these checks, so that it's all part and parcel of the same scheme, the same plan of Tofi Caruna. Except that the two women were pretty much passive, kind of shrug your shoulders, oh, okay, reference, mailbox, whatever. It would be different, perhaps, if he cashed the checks and then gave all the money back to Caruna. But something's a little bit funny when you cash checks and then you, you keep part of the money. You know, again, I get to the, kind of the light bulb has to go on at some point. That with intent, you know, he's, cash, he's doing this. It doesn't, doesn't, it's not in the blink of an eye, you have to go do it. He did it repeatedly, kept the $7,000. I guess I get back to what Judge Hardiman asked, how, you know, how does it, how would it really affect the outcome? Because, okay, so initially he was told to tall tale. And Caruna told a lot of people tall tales. But then you come to a point where he's acting and he has conduct that is, is, you know, criminal. And you'd have to believe that the jury would, would find that the tall tale aspect somehow continued. And you know, took over his mind as he's going into the bank and then pocketing some money. I just think the harmless error aspect is difficult. So how do you get past the fact that he actually committed some bad acts here. And said in a confession that he, he knew he did as compared to the other women. Okay, well, I, I wouldn't, I think the, the, the record with respect to the, the confession I think needs to be delved into a little more. Because one of the things that I did on cross examination with Agent Motileski is, you know, I, I asked him, did you ever ask him if the checks were fraudulent? He said, no, I never asked him that. Did you ever ask him if you forged the checks? And in fact Mr. Agent Motileski said that he was professionally embarrassed by his failure to do that. So, the. In fact, didn't he actually write the signature to look as much as he could to the signature of the payees? I, I, I think that someone, that, that, you know, someone did that, whether that be Taufiq or, you know, that you know, I believe that the testimony is, and I haven't looked at the, the record on this for a while, is that the checks were were signed previously. I mean, I have to, I, I apologize for my not looking at that part of it. It's been a little while. I think your time is up. Do you have any more questions? Yes. Okay, we'll get you back on rebuttal. Thank you. Thank you. May it please the court, I'm Stephen G. Sanders, on behalf of the United States, the appellee in this matter. I'd like to start in reverse order and start with the harmless error argument and work back to the question whether there was any error here. I'm, I'm glad to hear you say that, and I'm sorry to cut you off so quickly, but isn't it true there was evidentiary error here? This, this should have come in. You had a defendant testifying his own defense that he was duped. And the testimony from these proffered witnesses would have corroborated that and made his story at least a little more plausible, right? And could you please speak up when you're talking? I'd be happy to. Okay. And answer that question. I'll answer that question. The, the problem is, I don't think that the theory of relevance that's being argued on appeal was properly argued to the district court. And I say that for two reasons. In the eliminating motion, which by the way, the only citation to a third circuit case in there is to Stevens, not to the subsequent case in Williams, which clarified that Stevens doesn't allow propensity evidence in when the defendant is a proponent. But in the written motion, the defendant basically said, because Mr. Haruna lied to these two women, it's more likely than not that he lied to me, and less likely therefore that I, that I knew that these checks were false and fraudulent. That sounds like a propensity argument. At oral argument. That sounds like a propensity argument. A propensity argument. At oral argument. Speak up. I'll be happy to. At oral argument, Mr. Carter made the same argument he made in this court, that, that Mr. Haruna embarked on a pattern of deception and lies. I mean, that sounds a lot like propensity. Embarked on a, you know, he's a, he, he lies to everybody. Therefore, it's more likely that he lied to me. It's relevant. Didn't the district court say it wasn't relevant? He said it wasn't relevant. That's wrong. Well, it's. I thought you both agreed that that was wrong. Right. Well, I agree that it's, it's, it's relevant, it's relevant if the purpose which is being offered is to show propensity. Propensity evidence is relevant, but that's why rule 404B keeps it out, because you're not supposed to make the argument that because someone acted like this on one occasion, they acted in conformity with that, that character trait on the present occasion. Why isn't it common scheme or plan? Why, why doesn't it fit into that exception? Well, and, and this is where I think, you know, Judge Walz was onto something. The, the, and, and Judge Rundell, you asked this question. This, the alleged lies to the women aren't really lies. They're half-truths. He says to one of them, he's. Well, they're not true. But. I don't know if it's not, isn't not true the other side of lies. Well, let me, let me draw that string out. Sure. For one of the Miss Ogunsula, I believe. He says, I need to use your address as a reference. Right? Well, Judge Walz challenged the, the defense counsel on that. So what is, where's the lie there? He's like, well, he didn't, he didn't tell her, I need to use her address as a reference because I'm committing a fraud against the government. So, it's, it's sort of. It wasn't as a reference. No, well, see, it's, it was to obtain mail, which, which he did. He obtained, and two of the checks went there. Look, we can, we can, I, I don't have to tarry long on the question whether the profit that was made and the argument that was made articulated a proper purpose or not. I've said in my brief that I don't think Judge Walz approached this correctly because, and if he had, he would have, you know, and if we had. I, I, I, I found your candor on that refreshing, but what I'm, what I'm hoping you'll concede here, and maybe you won't, but is that really the, the battle is joined between both sides really on the harmless error question, not on the question of whether there was error. I, I, I'm willing to say that, yes. And let, and let me step to the harmless error argument because what Mr. Carter said in his for either district judges or even court of appeals judges to assess the weight and credibility of potential defense evidence and perform a harmless error analysis, if that were true, we would never have a harmless error inquiry where marginally probative evidence is excluded. Under that theory, you would always have to award a new trial because we can't know what the jury would have done with it. But in this case, for reasons that the panel has already cited, we, we have a very strong harmless error argument for a number of reasons. And the $7,000 check is one of the main ones. And it's not just because he kept that entire amount of money, but what does it say that he kept that money and then has subsequent interaction with Mr. Haruna when, remember, after he's approached by the agents, they ask him, will you try to re-ingratiate yourself? Right? And he makes a couple of calls, and those are in my supplemental appendix. But one would expect there to be acrimony between Mr. Haruna and the defendant if he had kept $6,000 of money he wasn't supposed to, that was supposed to go to a legitimate taxpayer who was expecting an IRS refund, right? There's nothing like that there. He asked them for a reference, Mr. Colley does for a job application, and Mr. Haruna obliges. So the fact that he kept, keeps the entire $7,000 and then has subsequent interaction with Mr. Haruna, and there's no talk about that, strongly suggests that they both knew that this was a fraudulent check, that this was- A fraudulent check. Right. The question is, did Colley know? He certainly was, at the very least, willfully blind to that fact. Even if this evidence of a plan to use unwitting dupes comes in, if we have to follow the string of relevance that's necessary for that to have any probative value, and I put this in my brief, the sort of knowledge by proxy argument, right? They were duped, therefore I was duped too. The number of steps you have to go through to get to that point, right, you first have to show that there was misrepresentation to either of these two women. Number two, that they- So you're not suggesting that, I mean, these women are clearly innocent, right? Nobody is suggesting that they were part of this deal, right? Well, I think they weren't charged, but we don't know how that, I mean, certainly the working assumption of the, of our discovery letter and producing it under Brady was that they said that they had no knowledge of the fraud. But that certainly, what could have happened on cross-examination or at trial might have been very different. But if they did have knowledge, that certainly- Doesn't that go against your argument, then? Doesn't that, shouldn't that mean that it should have come in and you could have cross-examined them? They would have been your witnesses or defense witnesses? They would have been defense witnesses. And the working assumption of the argument, of the harmless error argument, is that even if he had called them and they had testified exactly as the letters represent and they had denied knowledge, let's assume that they do that, the fact that they denied knowledge of the fraud based on what Mr. Haruna said to them or didn't say to them doesn't move the ball in any way toward a conclusion, number one, that Mr. Haruna, that Mr. Kali didn't know. Is that because Kali profited from the scheme and the ladies didn't, or- That's one of the reasons. He had far more extensive interaction, right? And we can look at the, I've listed in my harmless error section in my brief, the details of how this scheme was executed. But that is the alternating banks, one of the cashing the checks one at a time, which suggests that they're worried that, you know, they're going to get caught and they want to see- Well, didn't they come in seriatim? I mean, they didn't come in all together. No, but- How else could you have done it other than one at a time? Well, they, but Mr. Haruna, the testimony was that Mr. Haruna told Mr. Kali that he had a number of checks. He had a bunch of them. But instead of giving them all to Mr. Kali and saying, here, go cash them, he gives them to him one at a time. What ever happened to Haruna, by the way? Do we know? He's under investigation. Is that it? He's not on trial. Yeah. Did Kali have an explanation for why he used different bank accounts? I don't believe he had a good explanation for that at trial. And here's another, and this is another, it's an argument we didn't make to the jury, but one that jumps out from this scheme I made in my brief. Why, if Mr. Kali is so hard up for money, right, and he admits his financial problems are making, you know, made him blind to what was going on, why not have Mr. Haruna just lend him the money? Why do we have to create this additional layer of involvement where Mr. Haruna says, you can make some money by taking this check and cashing it, and giving the, you know, taking $300, giving the $2,000 back to me, and I'll go give it back to the intermediary who will then give it to the supposed victims. I mean, everything about this scheme cries out that it's just, you know, that no one who is participating in it could be, could say that they didn't know what was going on unless they were consciously avoiding. Well, the two ladies could have said that. They didn't know. In fact, they did. Well, presumably they would have. But they, but they weren't handed checks to cash. And I'm, and I think that was the argument that was made in the district court. If, if they had been given checks to cash and they were told these are legitimate checks and they believed that, absolutely this would have, would have relevance and, and we would maybe have a different harmless error argument and even a different outcome here because there'd be symmetry. Let me ask you to assume something that I, you surely disagree with. Assume for a minute that, that the so-called Katrina checks don't support your harmless error argument. Do you still win only on the strength of the IRS check? And if so, why? And particularly, would you address Mr. Carter's argument that that may have been some separate state crime, but not the federal crime that's charged? Right. There are several questions. Yes. And I, but the, the easy. You want me to break it down? No, but the easy answer is I agree with him that the, Mr. Colley's defense to the Katrina checks is the same as his defense on the IRS check. He, I think what Mr. Carter was trying to say that he may have, Mr. Colley may have been guilty of stealing $6,000 from Mr. Haruna, but that's not the crime that was charged in the indictment. In other words, his defense would still be that I, when I cashed this check, I believed it was a legitimate IRS check that was for a legitimate taxpayer who was expecting a refund, but for some reason couldn't, didn't have access to a bank account. And again, that seems implausible, but that's the argument. And the fact that I stole the proceeds of the check afterwards and didn't remit the entire, the $6,000 to Mr. Haruna means that I may have, I may have wronged Mr. Haruna, but I didn't wrong the United States government in the way that. I understand that would be his argument, but what I'm asking is if, if we deem the evidentiary error not to be harmless with respect to the Katrina checks, could it still have been harmless vis-a-vis the IRS check? And does the commission stand or would you lose in that instance? Well, I think there's a, there's certainly a way into the evidence that the, you can, that the IRS check stands in it on a different footing only because it's the last in time. Did you charge? I thought we heard from the appellant that you didn't charge the IRS check. No, we, we did charge it, but it was charged under the same theory as the Katrina checks. And so, but, but because it's the last in time, and by the way, Mr. Holly drove all the way up from Delaware to get this check and drove all the way back to cash it, which is another fact that weighs heavily against any error being prejudicial here and supports the conscious avoidance theory. But putting that to one side, I think because that check is the last in time, one could still conclude that even if he reasonably believed or was acting in good faith with respect to the Katrina checks, that by the time he got that IRS check and cashed it and kept the proceeds, that he certainly, there was ample evidence of conscious avoidance to support it. I'll just make two other points unless the panel has any other question. I mean, I've listed in the brief the facts that support the conscious avoidance theory. The fact that Mr. Talley could have introduced this evidence and said that this, my story is slightly more plausible because there's a pattern of deception lies here. It doesn't change the fact, our summation, our cross-examination, everything would have been the same. It still doesn't explain why he didn't say to the agents, right, I believe that these were legitimate checks from Hurricane Katrina victims. This is what Mr. Haruna told me. He didn't say that. That's the linchpin of his claim of good faith, and yet he doesn't tell the agents that. And that fact is true regardless of whether the testimony of these two women comes in or not. And that was what we stressed on cross and a summation, and the arguments would have been exactly the same. What was the phrase in his confession? He knew it was wrong or something along those lines. I mean, he not just, he didn't just not say about Katrina, but he said something affirmative. He said, it is wrong to cash checks that don't belong to you, which I realized past tense. He doesn't say which I realize now, which is all we argued and strongly shows that it's a confession that he knew at the time and realized at the time that he was cashing checks that didn't belong to him and that they were forged or at least fraudulent. If the panel has no other questions, I'm happy to sit down. We're happy to have you sit down. Thank you. Thank you, Your Honor. You have how many minutes of rebuttal? Three. Three. Thank you. In terms of harmless error, I understand your point. But I think, on the other hand, that this, you know, the evidence in this case came in together that there was no attempt by the government at this point to separate out the 404B from what evidence. And one of the distinct problems. Wait a minute, you just moved over something. Whatever, what? There was no attempt to distinguish the 404B evidence from the Katrina checks on the one hand and the IRS treasury check on the other hand. I think one of the problems that the court faces here and one of the reasons why you could look at this as a legal error rather than abuse of discretion is because the government took the erroneous position that it was irrelevant and Judge Walls adopted that position. If some of these issues weren't as, you know, fleshed out as well as they could have been because the- Tell us how they could have been. Well, because we spent our time talking about the relevance rather than the propensity, you know, of the evidence. I think we're beyond that. I think we're starting from the assumption it should have come in. But I think, at least speaking only for myself, the mountain you need to climb is the harmless error. Well, let's look at Ms. Ogunsulo's potential testimony, and I think it goes directly to harmless error. Her potential testimony is that if you flesh out what her testimony would have been, basically what happened is that checks, letters, mail were coming to her address. At some point, Ms. Ogunsulo received, you know, what presumably was a little, you know, yellow IRS envelope with checks in it, you know, addressed to another person. I thought they came separately. They didn't come all together? No, no. I'm just saying, well, let's say it's one. I'm sorry, but let's just look at one. At some point, she received a check. She received an envelope. She doesn't receive a check. She receives an envelope. Right, but with an IRS address on it. And I think it's pretty common knowledge what one of those envelopes contains. And certainly, if she was cross-examined at some point, you know, there are certain things about her testimony that could have been, you know, argued to be implausible, that she knew or should have known. But the government... No, but that, now you're getting into an aspect that's irrelevant. Whether she was duped is not relevant to whether he was duped. I mean, there may be six gullible people in the world and three not so gullible. The fact that she did or didn't believe, that's not... I don't think that is relevant. What's relevant is that due to the MO of Haruna, as your colleague said, it made his colleague's story slightly more plausible. But her having bought into it is really not relevant to whether colleague did, in fact, or should have. Right. What I was trying to say is that, what I was saying, on balance, the government's assessment of her testimony, that they accepted her statement that it was unwitting, on balance, in spite of what might be some countervailing facts. So what I'm saying here is that there are some facts that the government has raised, and I think, you know, the court is right to look at the $7,000 check as, you know, as countervailing evidence and all the other factors. But on the other hand, there's this very strong countervailing evidence that this man engaged in a pattern of deception, and his interactions with my client were part and parcel of that interaction. And so when the standard, obviously, is reasonable doubt, if the jury could have latched onto that and said, you know what, that's enough, that's what was going on here, there was this pattern of deception, we can't say for sure that Mr. Kali knew or should have known in spite of the countervailing. So that's why I mentioned Ms. Ogunsulo. Thank you. Thank you, gentlemen, we'll take the matter under advisement. Thank you.